1  Victor A. Sahn (CA Bar No. 97299)
      vsahn@sulmeyerlaw.com
2  David S. Kupetz (CA Bar No. 125062)
      dkupetz@sulmeyerlaw.com
3  Claire K. Wu (CA Bar No. 295966)
      ckwu@sulmeyerlaw.com
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Grand Ave, Suite 3400
   Los Angeles, California 90071
6  Telephone: 213.626.2311
   Facsimile: 213.629.4520
7

8  Attorneys for collab9, LLC,
   Debtor and Debtor in Possession

9            **UNITED STATES BANKRUPTCY COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11            **LOS ANGELES DIVISION**

| | |
|---|---|
| 12  In re | Case No. 2:21-bk-12222-ER |
| 13  COLLAB9, LLC, a Delaware limited liability company, | Chapter 11 |
| 14 | **OMNIBUS DECLARATION OF KEVIN B. SCHATZLE IN SUPPORT OF DEBTOR'S "FIRST DAY" MOTIONS** |
| 15  Tax ID:  95-4650291 | |
| 16 | Hearing: |
| 17          Debtor. | Date:    To Be Determined<br>Time:    To Be Determined<br>Place:    Courtroom 1568 |
| 18 | 255 E. Temple St.<br>Los Angeles, CA 90012 |
| 19 | |

20

21

22

23

24

25

26

27

28

VAS 2710474v5

1    I, Kevin B. Schatzle, declare:

2    **PRELIMINARY STATEMENT**

3    1.    I have personal knowledge of the facts stated herein. I can testify that said facts are

4    true and correct.

5    2.    I am the Chief Executive Officer of collab9, LLC, a Delaware limited liability

6    company (the "Debtor" or "collab9" or the "Company"). I am actively involved in and am

7    intimately familiar with, and have knowledge of and experience with, all aspects of the Debtor's

8    business operations, as well as its financial condition and standing, and the unified communications

9    industry in which the Debtor operates.

10    3.    collab9 is a cloud security service provider for managed voice, collaboration,

11    conferencing and contact center services for U.S. public sector and U.S. commercial customers.

12    Operating under the aegis of a General Services Administration ("GSA") approved Federal Risk and

13    Authorization Management Program ("FedRAMP") Authority to Operate ("ATO") "in process" at

14    the moderate level.[1] collab9 uniquely caters to the public sector marketplace. collab9 was one of the

15    first UC providers to be FedRAMP-authorized by the U.S. Government and operate at the moderate

16    impact level.[2]

17

18

---

19    [1] "There are two approaches to obtaining a FedRAMP Authorization, a provisional authorization through

20    the Joint Authorization Board (JAB) or an authorization through an agency. In the Agency Authorization
      path, agencies may work directly with a Cloud Service Provider (CSP) for authorization at any time. CSPs

21    that make a business decision to work directly with an agency to pursue an Authority to Operate (ATO)
      will work with the agency throughout the FedRAMP Authorization process." *See*

22    *www.fedramp.gov/agency-authorization/*

23    [2] "The FedRAMP PMO (Project Management Office) fields a number of questions about impact levels and
      the security categorization of cloud services. Federal Information Processing Standard (FIPS) 199 provides

24    the standards for categorizing information and information systems, which is the process CSPs use to
      ensure their services meet the minimum security requirements for the data processed, stored, and

25    transmitted on them. The security categories are based on the potential impact that certain events would
      have on an organization's ability to accomplish its assigned mission, protect its assets, fulfill its legal

26    responsibilities, maintain its day-to-day functions, and protect individuals. Cloud Service Offerings
      (CSOs) are categorized into one of three impact levels: Low, Moderate, and High; and across three security

27    objectives: Confidentiality, Integrity, and Availability. *See www.fedramp.gov/understanding-baselines-
      and-impact-levels/--blog, dated November 16, 2017.*

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

4.      The Debtor commenced the above-captioned reorganization case by filing a voluntary chapter 11 petition on March 19, 2021 (the "Petition Date").  The Debtor continues to manage and operate its business as a debtor in possession.  No trustee or creditors' committee has been appointed in the Debtor's chapter 11 case.

5.      To minimize the adverse effects of the commencement of the Debtor's chapter 11 case, while at the same time preserving value for the benefit of stakeholders, the Debtor has filed a number of motions requesting various forms of "first day" relief (collectively, the "First Day Motions").

6.      I submit this Declaration in support of the First Day Motions.  The various forms of relief requested in the First Day Motions are necessary to maximize the value of the Debtor's estate (the "Estate") and allow the Debtor to sustain its current business operations in chapter 11 while it expeditiously pursues a sale, as necessary, to maximize the value of the Estate.

7.      I am familiar with the contents of each of the First Day Motions (including the exhibits and other attachments to such motions and related papers) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each of the First Day Motions: (a) will enable the Debtor to avoid damaging disruption to its operations and sustain its operations while in chapter 11; (b) is critical to the Debtor's ability to maximize the value of its Estate; (c) best serves the interests of the Estate and creditors; and (d) ensures continuity of operations of critical government communications systems and avoids an extended (i.e., several months) interruption of those services.  Further, it is my belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

8.      I was appointed CEO of collab9 in 2013 and oversee all business activities, including operations, marketing, sales, and service support.

9.      Prior to joining collab9, I held various senior executive positions with En Pointe Technologies and several related companies.  I hold a BA in History from the University of Texas.

10.      I began my career in the IT industry with Hewlett-Packard ("HP") in 1987, where I created HP's first Regional Sales Force Automation program for Southern California.  I co-founded En Pointe Technologies in 1993, helping to pioneer the first virtual e-commerce business model in

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  the computer reseller industry.  As Executive Vice President, I was instrumental in acquiring and

2  directing the support of key customers, representing hundreds of millions of dollars in purchases per

3  year.  I played a primary role in the creation of the many new distributor and partner alliances

4  necessary to grow En Pointe's business model to yearly sales of $600 million.  I am a leader in the

5  area of technology solution providers.  I have long and deep experience with state, local and federal

6  contracts and a long history of winning large enterprise and government sales contracts.

## BACKGROUND

### Brief History and Description of Debtor's Business

9      11.      collab9 provides best-of-breed, cloud-based services to those that wish to migrate

10  their **unified communications** ("UC") infrastructure to a managed, contractor-owned solution that

11  resides off the customers' premises.  collab9's secure unified communication solutions follow strict

12  federal guidelines (includes FIPS 200[3] and NIST 800-53[4] [5]compliance) for voice, video,

13  collaboration services, and contact center solutions for U.S. public sector and commercial customers.

14      12.      collab9 provides **unified communications as a service** ("UCaaS").  The company's

15  platform integrates voice, video, messaging, mobility, presence, conferencing, and customer care in

16  one predictable, user-based subscription model.  collab9 was one of the first hosted voice and

17  _____

18  [3] FIPS 200 is the second standard that was specified by the Information Technology Management Reform

19  Act of 1996 (FISMA). It is an integral part of the risk management framework that the National Institute of Standards and Technology (NIST) has developed to assist federal agencies in providing levels of information security based on the levels of information systems and a risk-based process for selecting the

20  security controls necessary to satisfy the minimum requirements. *See Computer Security Resource Center.*

21  [4]  "NIST is responsible for developing information security standards and guidelines, including minimum requirements for federal information systems. Such information security standards and guidelines shall not

22  apply to national security systems without the express approval of the appropriate federal officials exercising policy authority over such systems. This guideline is consistent with the requirements of the

23  Office of Management and Budget (OMB) Circular A-130." *See  Security and Privacy Controls for Information Systems and Organizations,* NIST Special Publication 800-53 Revision 5, September, 2020.

24  [5] "The National Institute of Standards and Technology (NIST) Information Technology Laboratory (ITL)

25  promotes the U.S. economy and public welfare by providing technical leadership for the Nation's measurement and standards infrastructure. ITL develops tests, test methods, reference data, proof of

26  concept implementations, and technical analyses to advance the development and productive use of information technology (IT). ITL's responsibilities include the development of management,

27  administrative, technical, and physical standards and guidelines for the cost effective security of other than national security-related information in federal information systems." *See  Security and Privacy Controls*

28  *for Information Systems and Organizations,* NIST Special Publication 800-53 Revision 5, September, 2020.

1    collaboration services providers in the marketplace to meet the rigorous National Institute of

2    Standards and Technology (NIST) defined FedRAMP requirements.  In addition to its government-

3    specific accreditations, collab9's solution is enterprise-class.  The company's platform infrastructure

4    meets the security, capacity and performance requirements of large-scale public sector and

5    commercial organizations.

6        13.    collab9 originated as a UCaaS division within En Pointe Technologies Sales, Inc.

7    ("EPTSI"), a reseller of hardware, software, and IT services.  On April 1, 2015, EPTSI sold its main

8    resale business assets to PCM, Inc., a competitor.  The En Pointe trade name was sold to PCM, so

9    EPTSI legally changed its name to collab9, Inc., with its parent company being Dinco, Inc.

10    ("Dinco").

11        14.    During 2016, Dinco reorganized collab9, converting the entity to limited liability

12    company ("LLC") status in Delaware in late 2016.  As of December 31, 2016, collab9 was a single-

13    member LLC wholly owned by Dinco.  On January 1, 2017, Fana Unified Communications, LLC

14    ("Fana") invested $7,500,000 in collab9.  Fana assigned its holdings to  Dollab, LLC ("Dollab").  As

15    a result of this investment, the ownership structure of collab9 changed so that Dollab owns 50% and

16    Dinco owns 50% of collab9.  Further, collab9 became a multi-member partnership for tax purposes

17    beginning January 1, 2017.

18        15.    collab9 has developed a highly secure cloud communications and collaboration

19    platform.  The Debtor provides telephony services and cloud-based data hosting to its commercial

20    and public sector customers.  collab9 serves as both a prime contractor to end-user customers and as

21    a subcontractor to prime contractors.  In many situations, the end-user customer may be transitioning

22    its outdated on-premises PBX phone system to newer technologies of cloud-based Unified

23    Communications (phone and other related services, including contact center application hosting).

24        16.    Sales to government and other public sector customers take much longer than sales to

25    a typical commercial customer.  It takes time to cultivate a government customer, explain and

26    convince them of the benefits of new technology, be approved for the bid, obtain the necessary

27    contract vehicle, obtain the necessary security authorizations, obtain the necessary employee security

28    clearances, establish the necessary connectivity to government networks, transition the services so it

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    is seamless without interruption of operations, and then deploy the new systems.

2    17.    A government agency does not decide overnight that it wants to change its telephone

3    system, contact center applications, and engineering architecture.  It is a long process both on the

4    customer side to perform due diligence on potential vendors, and then on the contractor/vendor side

5    to implement the solution.

6    18.    However, such sales to large institutions and government agencies also have

7    significant benefits.  Once a customer is deployed, the turnover to a new vendor is less likely due to

8    the capital infrastructure and engineering enhancements required.  Further, once a system is in place,

9    the value of add-on revenue becomes scalable.  There are more sunk costs upfront, but once there is

10    a successful deployment, the revenue stream is scalable, recurring, and long term.

11    19.    The transition from the "older" phone systems and on-premise contact center systems

12    to newer cloud-based telephony/contact center systems takes time, perhaps several months to years,

13    to set up the engineering architecture and deploy the services.  If the customer also demands

14    FedRAMP security protocols, this will further delay the deployment.

15    20.    collab9 was one of the first companies to receive FedRAMP authorization for Unified

16    Communications as a service in 2016.  The FedRAMP authorization process is costly and time

17    consuming, and it requires a high level of engineering expertise.

18    21.    collab9 is continuing to operate its business and, as discussed below, is taking action

19    to address the challenges of a liquidity crisis.

20    22.    As a subcontractor under government contracts with the Federal Government and

21    localities, collab9 must maintain its operations involving the provisions of telephony/contact center

22    services and hosting services to essential agencies if it is to ensure continuity of these critical

23    communications services and avoid extended (i.e., several months) service interruptions.

24    23.    collab9 currently provides critical communication services to U.S. Customs and

25    Border Protection ("CBP")—hosting the internal call centers for CBP's internal human resources

26    (Offices of HRM), the CBP Information Center, and the Traveler Communications Center. collab9

27    also provides critical services to U.S. Health and Human Services ("HHS"), the Defense Nuclear

28    Facilities Safety Board ("DNFSB"), and the CenturyLink (now Lumen) Internal Helpdesk for the

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   Commonwealth of Pennsylvania ("COPA").  DNFSB advises the Secretary of Energy on the safety

2   of the nation's nuclear defense facilities. HHS includes the National Institute of Health ("NIH"),

3   which is one of the critical federal agencies overseeing the response to the COVID-19 pandemic.

4   Services for NIH would include, for example, the voice mail for critical executive personnel

5   managing the pandemic.

6         24.      Specific examples of critical government systems that could be interrupted (and the

7   resulting disasters that could occur) if the ongoing operations of collab9 are disrupted or

8   discontinued due to a lack of funding or otherwise, include:

9   **CBP (Customs and Border Protection)**—collab9 hosts three contact centers (the software used by the
    CBP call center agents). I would speculate the most critical is CBP's Internal HR Support Center.
10  *Their Mission: With more than 60,000 employees, U.S. Customs and Border Protection, CBP, is one of the
    world's largest law enforcement organizations and is charged with keeping terrorists and their weapons*
11  *out of the U.S. while facilitating lawful international travel and trade. As the United States' first unified
    border entity, CBP takes a comprehensive approach to border management and control, combining*
12  *customs, immigration, border security, and agricultural protection into one coordinated and supportive
    activity.*
13

14  **HHS (Health and Human Services)**—collab9 provides voicemail and auto attendant for HHS (press 1 for
    the CDC, etc.). These people are managing the federal government's response to the pandemic.
15  *Their Mission: To enhance the health and well-being of all Americans, by providing for effective health and
    human services and by fostering sound, sustained advances in the sciences underlying medicine, public*
16  *health, and social services.*

17  **DNFSB (Defense Nuclear Facilities Safety Board)**—collab9 provides DNFSB's phone service.
    *Their Mission: To provide independent analysis, advice, and recommendations to the Secretary of Energy*
18  *to inform the Secretary, in the role of the Secretary as operator and regulator of the defense nuclear
    facilities of the Department of Energy, in providing adequate protection of public health and safety at such*
19  *defense nuclear facilities.*

20        25.      As indicated above, the lead time required for collab9 to deploy communications

21  services from old telephone technologies to cloud hosting can be many months, or even years, due to

22  coordination with the customer and multiple vendors, and resolving unpredictable connectivity

23  issues.  Additionally, certain government customers require FedRAMP security protocols, and in

24  some cases collab9 employees are required to have security clearances before being able to work

25  with the customers.  These clearances, issued by the government, can take many months and even

26  years to obtain.

27        26.      The prime contractors on federal contracts under which collab9 provides services

28  include Verizon (HHS) and Presidio (CBP and DNFSB).  collab9's contracts are with these prime

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  contractors. (Presidio is a subcontractor to CenturyLink on DNFSB and COPA.)

2      27.    collab9 houses its servers and equipment in two Equinix data center facilities: one in

3  downtown Los Angeles, the other in Chicago.  collab9 intends to maintain and continue the data

4  center operations at these facilities as well as its Network Operations Center ("NOC") in Boulder,

5  Colorado.

6      28.    Due to a liquidity crisis, without additional funding, collab9's operations would have

7  had to cease in the beginning of March, 2021.  However, in order to protect the interests of creditors

8  and equity holders, and due to the mission critical nature of collab9's communications services to

9  essential government agencies, the Debtor found a path forward, including (as discussed below)

10  obtaining funding, a commitment for additional essential financing, and implementation of a process

11  to protect and preserve its business and the value of its business/assets through a sale process to be

12  implemented in this chapter 11 case.

13                          **Management Team**

14      29.    I have led the Debtor throughout its existence and continue to direct its day-to-day

15  operations, with the assistance of a management team, including:  Mustafa Baig, CTO; Steven

16  Boberski, VP Business Development; Brian Campbell, Sales Vice President; and Gina Lim, Interim

17  CFO.

18      30.    As stated above, as CEO of the Debtor, I oversee all business activities, including

19  operations, marketing, sales, and service support.

20      31.    As CTO of the Debtor, Mustafa Baig[6] is responsible for all aspects of engineering for

21  the Debtor and also manages the FedRAMP process for collab9.  He has been recognized as a

22  subject matter expert in the FedRAMP accreditation/authorization process.  Under Mr. Baig, collab9

23  has obtained its FedRAMP moderate Authority to Operate (ATO) for Platform as a Service,

24  Infrastructure as a Service, and Software as a Service. Our FedRAMP authorization is currently "in

25  process" while we wait for CBP to issue their formal accreditation.

26      32.    As Vice President of Business Development, Steven Boberski is responsible for

27

28

---

[6] Mr. Baig is a relative of  Bob Din, the principal of Dinco, one of the two members of the Debtor..

VAS 2710474v5

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  collab9's product management, marketing, and pre-sales engineering.

2      33.    As the Debtor's Vice President of Sales, Brian Campbell's primary focus is driving

3  new business, concentrating on public sector opportunities, managing the sales channel, and working

4  to improve customer experience through positive collaboration.

5      34.    Gina Lim became the Debtor's Interim CFO, effective January 5, 2021, upon the

6  retirement of her predecessor, Javed Latif.  Gina is responsible for accounting, finance, tax, and risk

7  management and was a consultant for collab9 and its predecessor companies. Gina is a Certified

8  Public Accountant and provides services to the Debtor as an independent contractor.

9      35.    The Debtor's "officers" and other management personnel are not on the board of the

10  Debtor, are not equity holders (members) of the Debtor, and are not granted management authority

11  under the Debtor's governance documents.  Pursuant to sections 5.1 and 5.2 of the Debtor's operating

12  agreement, the management of the Debtor is controlled by the Debtor's board.[7]

13      36.    George Blanco was appointed as the Independent Director for the Debtor on March

14  19, 2021.  His responsibilities shall include monitoring the sale process of the Debtor's

15  business/assets, participating with the Debtor's CEO and bankruptcy counsel in decisions relating to

16  the sale process, reviewing DIP financing terms, and other general operational issues that arise

17  during the Chapter 11 case.  The Independent Director's experience includes providing both financial

18  and operational advice to primarily middle-market companies in transition, serving as Financial Advisor

19  and Chief Restructuring Officer ("CRO") to companies, private equity, and lenders. His background

20  serving as a consulting partner in the large firm accounting and consulting firm environment for over 20

21  years provides unique "how to" implementation experience advising divisions of Fortune 500

22  companies and businesses with revenues ranging from $75M to $3B.  Mr. Blanco is a principal of EMA

23  Group, which provides services that lead to operational improvement to financial performance,

24  improved cash flows and working capital management. Its principals have decades of experience

25  preserving and creating added value for scores of companies. (www.ema-group.com).

26

27  [7] The Debtor's Board of Directors consists of Attiazaz "Bob" Din (representative of Dinco), Stephen

28  L.Pruss (representative of Dollab), and Mr. George Blanco, as the independent director (the "Independent Director").

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Employees and Independent Contractors**

37.    The Debtor has 18 employees (2 of which are inactive and not drawing salary) and 4 independent contractors who perform services relating to day-to-day operations.  Currently, most of collab9's employees are remote, and work from home, except for 3 employees working at the collab9 NOC in Boulder, Colorado.  The Debtor maintains its headquarters office at 21515 Hawthorne Blvd., Suite 200, Torrance, CA 90503.

**Company's Financing History**

38.    In 2018, Dinco and Dollab both made working capital bridge loans and convertible loans to keep collab9 afloat.  Dollab loaned $3,750,000 and Dinco loaned $1,250,000 in bridge and convertible unsecured notes.  They have each invested many millions more to capitalize collab9 through Dollab and Dinco.

39.    In May 2019, Avaya Inc. ("Avaya") loaned $10,000,000 to collab9 under a convertible unsecured note.  Avaya required Dinco and Dollab to enter a subordination agreement with Avaya subordinating repayment of their loans to repayment under the Avaya note.  collab9's relationship with Avaya began in March 2017.  collab9 first met with Avaya with a perceived mutual objective of developing a strategic business relationship in which collab9 would use its considerable FedRAMP experience gained with Cisco UC products to obtain FedRAMP compliance for Avaya's UC products.  collab9 committed to Avaya that it would be FedRAMP authorized by October 8, 2017, and collab9 succeeded in meeting its commitment.  In August 2017, collab9 and Avaya entered a five-year master global hosting and OEM reseller agreement (the "Avaya Agreement").

40.    Unable to obtain any other source of funding and facing a severe liquidity crisis in February 2021, collab9 obtained a secured loan from Dollab in February 2021 in the sum of $200,000.  Thereafter, Dollab assigned its loan to SecureComm. LLC ("SecureComm") and SecureComm made an additional pre-petition secured loan to the Debtor in March 2021 in the sum of $380,000.  SecureComm is an affiliate of Dollab.  SecureComm has also agreed to provide the Debtor with a secured line of credit, subject to Court approval, as necessary debtor in possession financing in collab9's chapter 11 case.  This secured claim of SecureComm is the only secured debt of collab9, with the exception of certain equipment financing.

41.    Further, this secured financing to be provided by SecureComm is necessary to address collab9's liquidity crisis, while continuing and preserving its going concern operations and value, including preserving collab9's relationships and contracts with its customers and ensuring continuity of operations of critical communications systems for federal and state agencies while avoiding extended (i.e., several months) service interruptions.  As discussed below, this secured financing is essential in order for the Debtor to have even the limited time needed to pursue an expedited sale process. (The process by which the Debtor reached its liquidity crisis is described below.)

42.    As of the commencement of this chapter 11 case, collab9 has outstanding  unsecured debt estimated at approximately $20,000,000.

## AVAYA INVESTMENT IN THE DEBTOR AND FEDERAL RISK and AUTHORIZATION MANAGEMENT PROGRAM (FedRAMP)

43.    Central to the current imperiled status of the Debtor is its business relationship with Avaya Holdings, Inc. ("Avaya"), which will be described in greater detail below.  The Debtor's business and operations have been severely undermined by the actions of Avaya.  collab9 has concluded that Avaya has acted in bad faith in a number of different ways during the course of their relationship, with the hidden goal of obtaining collab9's expertise and know-how to enter the public sector cloud-based UC market.  Avaya misled and deceived collab9, violated its contract with collab9 by terminating contracted customer deployments without cause, and otherwise sought to sabotage collab9's business.  collab9 has engaged special litigation counsel to pursue its rights and remedies against Avaya which are more fully described below.

44.    According to its recently filed Form 10-Q statement, Avaya "… is a global leader in digital communications products, solutions and services for businesses of all sizes delivering its technology predominantly through software and services. Avaya builds open, converged and innovative solutions to enhance and simplify communications and collaboration in the cloud, on-premise or a hybrid of both. The Company's global team of professionals delivers services from initial planning and design, to implementation and integration, to ongoing managed operations, optimization, training and support. The Company manages its business operations in two segments,

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Products & Solutions and Services. The Company sells directly to customers through its worldwide sales force and indirectly through its global network of channel partners, including distributors, service providers, dealers, value-added resellers, system integrators and business partners that provide sales and services support…"  Avaya is a large, multinational corporation with clients worldwide.  Avaya specializes in business communications, specifically **unified communications** (UC), **contact center** (CC), and services.

45.     Serving organizations at 220,000 customer locations worldwide, Avaya is the largest pure-play UC and CC company, ranking No. 1 in CC and No. 2 in UC and collaboration. The company had revenues of $2.89 billion in fiscal year of 2019, 83% of which was attributed to software and services.

46.     Avaya is a spinoff from Lucent Technologies, which itself was a spinoff from AT&T.  Avaya remained a public company from 2000 to 2007, when it was purchased by private equity firms.  It is now a public company again, selling its shares on the New York Stock Exchange under the symbol 'AVYA'.

47.     Avaya filed its own Chapter 11 Petition on January 19, 2017.  Avaya Inc. and 17 affiliated debtors each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  On November 28, 2017, Avaya confirmed its Second Amended Plan of Reorganization and emerged from its Chapter 11 cases.

48.     In March, 2017, collab9 first met with Avaya with a mutual objective of developing a strategic business relationship in which collab9 would use its considerable FedRAMP experience gained with Cisco UC products to now obtain FedRAMP compliance for Avaya's UC products. collab9 committed to Avaya that it would be FedRAMP authorized by October 8, 2017, and collab9 succeeded in meeting its commitment.  "FedRAMP" refers to the Federal Risk and Authorization Management Program.  According to the "FedRAMP" website (fedramp.gov), "…the Federal Risk and Authorization Management Program was established in 2011 to provide a cost-effective, risk-based approach for the adoption and use of cloud services by the federal government.  FedRAMP empowers agencies to use modern cloud technologies, with an emphasis on security and protection

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

of federal information…" It is a government-wide program that provides a standardized approach to security assessment, authorization, and continuous monitoring for cloud products and services. FedRAMP empowers agencies to use modern cloud technologies, with emphasis on security and protection of federal information, and helps accelerate the adoption of secure, cloud solutions.

49.    The Joint Authorization Board (JAB) of the FedRAMP includes the chief information officers (CIOs) from the Department of Defense, Department of Homeland Security, and General Services Administration (GSA). The JAB serves as the primary governance and decision-making body for FedRAMP.

50.    The FedRAMP Program Management Office (PMO) resides within GSA and supports agencies and cloud service providers through the FedRAMP authorization process and maintains a secure repository of FedRAMP authorizations to enable reuse of security packages. FedRAMP  provides one set of standards for all government agencies and all cloud providers.

51.    FedRAMP simplifies security for the digital age by providing a standardized approach to security for the cloud. The PMO's mission is to promote the adoption of secure cloud services across the U.S. government by providing a standardized approach to security and risk assessment.

52.    The U.S. government requires all cloud services used by federal agencies to meet a meticulous set of security standards set forth in FedRAMP, because the exchange of government data may have national security implications. There are approximately 160 federal agencies that may only contract for cloud communication services with FedRAMP-authorized companies.[8]

53.    Getting FedRAMP authorization is an arduous task. The level of security required is mandated by law. There are 14 applicable laws and regulations, along with 19 standards and

---

[8] "There are two approaches to obtaining a FedRAMP Authorization, a provisional authorization through the Joint Authorization Board (JAB) or an authorization through an agency. In the Agency Authorization path, agencies may work directly with a Cloud Service Provider (CSP) for authorization at any time. CSPs that make a business decision to work directly with an agency to pursue an Authority to Operate (ATO) will work with the agency throughout the FedRAMP Authorization process." *See* FedRAMP Agency Authorization, **www.fedramp.gov/agency-authorization**.

1  guidance documents. For FedRAMP moderate (collab9 in-process), there are 325 security controls in

2  17 control families. It's one of the most rigorous software-as-a-service certifications in the world.

3     54.    All cloud services holding federal data require FedRAMP authorization. Thus, if a

4  company wants to work with the federal government, FedRAMP authorization is an essential

5  component of the company's security plan and go-to-market strategy.

6     55.    Cloud service providers that are FedRAMP authorized are listed in the publicly

7  available FedRAMP Marketplace. This marketplace is the first place government agencies look

8  when they want to source a new cloud-based solution. It is more efficient for the agency to use a

9  product that is already authorized than to start the authorization process with a new vendor.

10    56.    As a result, being listed on the FedRAMP Marketplace makes a company much more

11 likely to get additional business from U.S. government agencies, and it improves the company's

12 profile in the private sector.

13    57.    FedRAMP authorization tangibly demonstrates the company's commitment to

14 meeting the highest security standards and allows a client to feel more confident about the security

15 protocols.

16    58.    When dealing with different departments of the federal government, such as U.S.

17 Customs and Border Protection, Health and Human Services, or the Department of Defense, a

18 contractor must obtain FedRAMP authorization from each of them as well as others with whom the

19 Company may seek to do business.

20    59.    On August 31, 2017, a five-year master agreement was executed between Avaya and

21 collab9.  At that point, consistent with its size, and in reliance on its agreement with Avaya and the

22 promises contained therein which were also made in writing, collab9 repurposed a large percentage

23 of it business toward Avaya.  Subsequently, Avaya purported to terminate its primary agreement

24 with collab9 on one day's notice.  Not only that, but Avaya also terminated many or all of the

25 beneficial agreements entered with collab9 in order to keep the service delivery within Avaya.

26    60.    The Avaya Agreement contained no "termination for convenience" clause. Avaya

27 provided detailed sales forecasts in writing to collab9 projecting Avaya's delivery of over 700,000

28 "seats" onto the collab9 platform within those five years.  A "seat" is a software license based on the

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  number of users who have access to the software. For example, a 100-user license based on users

2  means that up to 100 specifically named users have access to the program. Per seat licensing is

3  administered by providing user-level security to the directory containing the program.  Contracts

4  entered into by collab9 with its customers to provide collab9 services are priced or result in

5  payments to collab9 based upon the number of "seats" that the customer offers.  The 700,000 seats

6  promised in Avaya's detailed sales forecasts would be sold by Avaya to prospective customers and

7  billed by collab9 to Avaya at anywhere from $4 to $6 per seat per month, resulting in sales just from

8  the Avaya relationship that would range between $2.8 million and $4.2 million per month.  Avaya

9  would deliver Verizon as a prime contractor reselling collab9's services through Avaya, change

10  Avaya's sales compensation plan to promote cloud sales, bring two federal sponsors with a

11  FedRAMP Authority to Operate (ATO), and make collab9 Avaya's exclusive federal cloud offer.

12      61.    With the Avaya Agreement made in 2017, collab9, which was a small company,

13  geared its entire business and operations to work to be positioned to have the employees and

14  computer hardware and software infrastructure to service the customers that Avaya was going to

15  resell collab9's services to.  Avaya loaned $10,000,000 on May 20, 2019 to collab9 as a Convertible

16  Note in order to underwrite the cost of creating this organization geared to Avaya's specifications

17  and customers.  Prior to Avaya making this loan, collab9 had been in discussions with

18  ConvergeOne[9] about making an investment or purchase of collab9.  ConvergeOne is a competitor

19  and channel partner of Avaya.  To block a strategic relationship between ConvergeOne and collab9,

20  Avaya wrote a specific caveat into the note agreement, stating that collab9 could not accept equity

21  from ConvergeOne: "[collab9 cannot] enter into any corporate strategic relationship with

22  ConvergeOne Holdings, Inc. and its successors or assigns that involves the payment, contribution or

23  assignment by the Issuer or to the Issuer of assets in excess of $100,000...."  Promissory Note, at p.

24  11.

25  

26  [9] ConvergeOne is a leading IT services provider of collaboration and technology solutions for large and
medium enterprises.  Their technologies span the core technology markets- customer experience,

27  cybersecurity, data center, enterprise networking, and unified communications. They deliver these solutions
across a number of delivery models including on-premise, and in private, hybrid, and public clouds as well

28  as the proprietary ConvergeOne Cloud.  ConvergeOne has annual revenues approaching or perhaps
exceeding $2.0 Billion and 2,600 employees.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

62.     Avaya senior executives repeatedly assured collab9 that their internal competing platform was no longer being developed and that the collab9 platform was Avaya's chosen route to market. However, Avaya did not cease those development efforts.  Patrick Goins, a director of cloud service development and delivery at Avaya, was assigned by Avaya to oversee collab9's project and product development from the Avaya-side, despite his team's failure for at least three years to obtain a FedRAMP authorization for Avaya's own UC cloud solution. Goins repeatedly misrepresented himself to collab9 as our "advocate" within Avaya.  The conflict of interest of Mr. Goins serving in this capacity is obvious.

63.     Mr. Goins continually attempted to obtain access to collab9's FedRAMP System Security Plan ("SSP") – the primary source of collab9's trade secrets.  Goins repeatedly attempted multiple times to obtain access to collab9's SSP that describes how collab9 obtained the FedRAMP authorization for the Avaya solution within collab9's security boundary.

64.     Just months after signing the Agreement with collab9, on or about December 11, 2017, Avaya started the process of seeking FedRAMP authorization independent of collab9 without disclosing this fact to collab9 and contrary to repeated assurances made by Avaya senior executives to collab9 that Avaya was discontinuing its own FedRAMP cloud offering.  Remarkably, and again after Avaya senior executives provided collab9 with repeated assurances to the contrary, on or about May 15, 2018, Avaya's application for FedRAMP authorization was designated by the General Services Administration to be "in process."

65.     In the meantime, believing that their contracting counter-party was acting in good faith and in a commercially reasonable manner, collab9 moved ahead with building its infrastructure and marketing to potential government customers.  Lead time for new business in government can potentially take years for UCaaS services and products. Very slow moving, large federal agencies have a lot of red tape bureaucracy. It takes years to cultivate a relationship and build trust.  UCaaS products (cloud-based VoIP services versus old PBX and Centrex lines) also require capital investment and infrastructure. These sales do not happen overnight. Further, the federal government demands a high level of security due to hacking and spying.

66.     By the spring of 2019, collab9 ran out of money, as our investors had spent over $10

1    million funding the company based on Avaya's promises. The collab9 staff was devoting most of its

2    time to Avaya initiatives, and yet Avaya never even came close to meeting any of its sales

3    projections. As for Loudoun County, Virginia, one of the potential customer opportunities, despite

4    the fact collab9 was building out the entire environment, the total billing amount for the Company

5    was going to be negligible compared to its total cost to deliver the service.

6        67.    Since Avaya still had not been able to make their internal platform ready for market,

7    and because certain groups within Avaya did not want to use that internal platform due to previous

8    failures by the Avaya technical team, Avaya management offered collab9 a $10 million convertible

9    note that was to convert to equity in the future. As more fully detailed below, collab9 never

10   imagined that the terms of this note, despite collab9 obtaining tremendous traction in the

11   marketplace with Avaya by the spring of 2020, would ultimately be used as a weapon to prevent

12   collab9 from obtaining the capital necessary to keep its doors open and ensure continuity of

13   operations of critical government communications systems and avoid extended (i.e., several months)

14   service interruptions.

15       68.    In the early spring of 2020, collab9 started to gain major traction with Avaya and take

16   off. collab9 spent several hundred thousand dollars in labor costs and audit fees and began to take

17   Avaya's Contact Center applications through FedRAMP. Meanwhile, one of collab9's first successful

18   projects, Loudoun County, had already started to deploy successfully in the collab9 cloud

19   environment. collab9 spent several hundred thousand dollars building a provisioning portal for its

20   Avaya service platform to close the gaps between collab9's and Avaya's solutions. collab9 and

21   Avaya then closed an important U.S. Department of Health and Human Services (HHS) contract

22   through Verizon. Included with that Verizon deal was a commitment from HHS to sponsor collab9's

23   FedRAMP ATO.

24       69.    All throughout collab9's relationship with Avaya, Javed Latif, former Chief Financial

25   Officer of collab9, and I had monthly meetings with Avaya representatives to go over financial

26   statements, projections and cash flow.  collab9 was draining cash and would soon be without

27   adequate working capital. This was clear in every monthly meeting with Avaya.  In May 2020, after

28   collab9 and Avaya were poised to secure a position as a leader in the federal marketplace and were

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

poised to reap great rewards based on the previous three years of hard work (where collab9's entire small business organization was essentially devoted to the Avaya Agreement), as well as collab9 having built a custom software package for Loudoun County and other Avaya customers (at a cost to collab9 of $250,000), Avaya notified collab9 that it was winding down its relationship with collab9 and immediately beginning the process to transition all joint business opportunities and its existing customers hosted by collab9, including Loudoun County, from collab9 to Avaya's internal platform, which they said was finally ready.   In short, with no notice to collab9, the Avaya Agreement was unilaterally terminated.  I do not state this here for the purpose of litigating the Debtor's position on the merits of Avaya's actions.  That will be decided in separate litigation already commenced against them in another forum which is more fully described below.

70.     Avaya thereafter suddenly canceled accepted purchase orders and/or collab9's obligation to provide services to Loudoun County and Verizon/HHS, in May 2020, contrary to the express terms of the Avaya Agreement.  The customers collab9 had been marketing its products and services to, and the entire focus of collab9's prospects and operations, were through Avaya.  For Avaya to pull the rug out from under its relationship with collab9, and for Avaya to terminate at the time that it did, was egregiously damaging to collab9.  The contracts that it had (to the extent that they were not terminated by Avaya) with customers, as is always the case with the Federal Government and any of its agencies, was in small numbers of "seats" to start.  These are typically "trial" periods where the applicable federal agency or prime contractor, such as Presidio, CenturyLink and Verizon, sees if collab9's services are successful and if a good working relationship or rapport has developed, making a long-term commitment appropriate.   As shown below, collab9 was losing over $400,000/month, as revenues had not reached significant levels as of yet.  In May, 2020, collab9 had perhaps 9-10 months of capital left with which it could bridge its operations before it would be completely out of cash, a fact of which Avaya was completely aware.  Avaya was aware of this fact because, as stated above, we provided them with detailed financials on a constant basis and met with them once each month.

71.     In the meetings that occurred and the information that was provided, Avaya was taking full advantage of those provisions of the Convertible Note which prevented and prohibited

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

collab9 from accessing capital from any source other than Avaya, and which prevented and prohibited collab9 from selling its assets without Avaya's express approval.  On a constant basis since May, 2020, collab9 informed Avaya that it was running out of money, that it needed capital, and that Avaya needed to provide assistance given the provisions of the Convertible Note and the fact that Avaya had a veto right over any other capital source to the Company.  Further, with Avaya's $10 Million Convertible Note as leveraged debt on the Company, and with Avaya's conversion rights to equity under the Convertible Note, no one would be interested in investing in or providing debt on a secured or unsecured basis to the Company.  With capital running out in February, 2021, and with the only source of funds coming from the current interest holder(s) of the Company, a Chapter 11 filing became mandatory because of the need to seek the debt financing's approval under the Bankruptcy Code and the protection of the law from any further destructive action that Avaya might take, particularly in consideration of the filing of the Arbitration against them which seeks a recovery of eight figures.

72.    Termination of the Avaya Agreement may only take place for "cause."  This is defined in the Avaya Agreement as follows:

> Termination for Cause. Either Party may terminate this Agreement or of any individual Statement of Work for cause with immediate effect upon written notice if all the following conditions exist: (a) the other Party breaches the Agreement, (b) that breach has a material adverse impact on the non-breaching Party, and (c) the breaching Party fails to cure such breach within thirty (30) days following receipt of written notice describing the breach and where appropriate, identifying the individual Statement of Work which is the subject of the breach. *Avaya Agreement, at ¶9.2.*

73.    collab9 had started to turn the corner: it secured relationships with the major carriers that would sell the collab9 solution to the federal marketplace; secured a commitment for a FedRAMP authorization from HHS; and had several pilots running. All of this took years of work and would have led to significant revenue when Avaya took their nefariously-timed and precipitous action to terminate the Avaya Agreement.  Examples of those opportunities included:

> (a)    collab9 had a further deal with ConvergeOne and CBP. The ConvergeOne deal was a minimum six-month pilot for CBP. collab9 received an Avaya work order and accepted its purchase order to build the pilot environment for 50 CBP users. The total billing value of the pilot was a minimum of $24,000.00, and it would have been more when CBP

likely extended the pilot beyond the planned six-month commitment. The ConvergeOne/CBP opportunity was a minimum six-month pilot for CBP and could have eventually been rolled out to 3,000 seats during an initial phase at the Department of Homeland Security ("DHS"), which then could have grown to a significantly larger opportunity (tens of thousands of seats) with the success of the initial phase, sold through Avaya and ConvergeOne. The initial phase alone could have represented $15,000 per month revenue to collab9 as well as a $30,000 set-up fee.

(b)      CenturyLink and Verizon were moving forward with making collab9 its primary non-Cisco platform for UC, until Avaya terminated the collab9 agreement and ruined a huge opportunity for collab9. Verizon approached collab9 afterward, suggesting that collab9 provide the cloud service without Avaya, but collab9 did not have an  agreement allowing it to resell Avaya's software/services in this manner. The damages related to this lost revenue stream for collab9 could have been over $500,000 per month, based on 100,000 lost seats, plus the loss of a $1,000,000 one-time set-up fee.

(c)      collab9 had received indications from the State of New York that we would be moving forward with a large Unified Communications pilot.

(d)      collab9 also led the sales efforts for Avaya to get Avaya scheduled on the  CALNET4 contract: a primary source of UC for the State of California. This involved months of collab9's sales activity and an onsite visit with the customer in Sacramento. The value of this contract is extremely large, since California is one of the largest states in the country and has almost 235,000 active state employees.

(e)      collab9 also put Avaya on its own NASPO Cloud Contract, which gives state and local governments a way to purchase cloud services while bypassing the lengthy and costly competitive bid process.

74.    These are just some examples of the customer relationships and/or deals that were either closed or in process and that were terminated by Avaya's actions, including termination of the Avaya Agreement and Avaya's successful efforts to terminate contracts or discussions with customers, including those identified directly above.  Moreover, the FedRAMP approval that collab9 originally obtained was with the Federal Communications Commission and was in process with Health and Human Services before Avaya, by its termination of the Avaya Agreement, undercut collab9's ability to continue doing business with them; Avaya wanted to take over that FedRAMP authorization for itself.  Presently in connection with the Company's agreement to provide services to CBP, collab9 is operating under a temporary authority to operate with CBP.  collab9 has been informed by CBP that they are in the process of issuing our FedRAMP authorization.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

## FACTORS PRECIPITATING CHAPTER 11 FILING

75.     collab9's core assets include its FedRAMP authorization as well as several long-term contracts with institutional customers, which collab9 expects to become profitable in the future.  The FedRAMP authorization is valuable and difficult to obtain, requiring extensive, long-term efforts, and costing collab9 millions to secure.

76.     collab9 currently operates at a loss of approximately $518,000 per month, with a negative cash run rate of approximately $410,000.  This burn rate will increase in May 2021 as a result of Avaya transferring the Loudon County business away from collab9.

77.     During 2020, recognizing an impending liquidity crisis, collab9 repeatedly sought a reconciliation with Avaya.  Avaya declined.  collab9 also sought funding from other sources and determined that the only available funding would be provided by Dollab and then Dollab's affiliate, SecureComm.  No other lender was willing to fund collab9.  Among others, collab9 reached out for funding to collab9's bank, Mechanics Bank, and the bank declined to make any loan to collab9.  collab9 also sought funding for collab9 from asset-based and non-conventional lenders who declined to provide funding under the current circumstances.  Among the lenders contacted on behalf of collab9 who declined to provide funding were SG Credit Partners (a SAAS, ABL and Cashflow lender), LSQ (AR lender), and Utica Leasing (Equipment Finance lender). .

78.     As a result of the substantial funds previously invested in collab9, its FedRAMP authorization, and the long-term and ongoing development of its business and customer relationships, collab9 believes that its business/assets have substantial value and that the commencement of a chapter 11 case is necessary to preserve, protect and maximize that value and is required in order to facilitate a necessary sale of the collab9's business/assets.

79.     As discussed in greater detail above, collab9 has concluded that Avaya has acted in bad faith in a number of different ways during the course of their relationship, with the hidden goal of obtaining collab9's expertise and know-how to enter the public sector cloud-based UC market. Avaya misled and deceived collab9, violated their contract with collab9 by terminating contracted customer deployments without cause, and otherwise sought to sabotage collab9's business.  collab9 has engaged special litigation counsel to pursue its rights and remedies against Avaya and initiated

1    an arbitration proceeding against Avaya in February, 2021.

2                              **THIS CHAPTER 11 CASE**

3         80.    As discussed above, UCaaS products require substantial capital investment and

4    infrastructure.  Further, the sales process is lengthy.  The time to develop and obtain new business

5    with government entities can potentially take years for UCaaS services and products.  Large federal

6    agencies generally move slowly and impose numerous strict requirements. It can take years to

7    cultivate a relationship and build trust with government entities.  Additionally, federal government

8    entities demand very high security to protect against foreign hacking and spying.

9         81.    As of today, collab9 believes it has built a valuable business and platform, cultivated

10    important relationships, and entered significant contracts.  However, faced with a liquidity crisis, and

11    in order to maintain business operations, preserve and protect what it has built, maximize the value

12    of its business and assets, and ensure continuity of operations of critical government

13    communications systems and avoid extended (i.e., several months) service interruptions, it was

14    necessary for collab9 to commence this chapter 11 case.

15        82.    The  game plan in this case is to move forward with an expeditious sale process and

16    effectuate a sale of the company's business/assets.  While simultaneously seeking to market and sell

17    its business/assets for the highest and best price obtainable, through the initiation of the chapter 11

18    process, the company is also obtaining adequate working capital from SecureComm while

19    implementing a sale process and effectuating a sale.  Funding is limited and, based on the

20    Company's negative cash flow, completion of a sale in a limited period of time (before May 31,

21    2021) is imperative.

22        83.    As stated above, on March 19, 2021, Mr. George Blanco was appointed as an

23    independent director to collab9's Board of Directors.

24        84.    At the beginning of February 2021, at the request of collab9's Board of Directors, I

25    began actively marketing the Company assets to the logical buyers, including Avaya.   Avaya flatly

26    declined the offer to engage in sale discussions.  Avaya initially suggested they were open to consent

27    to a sale of collab9's business/assets, both in email and verbally to our counsel.   However, when we

28    attempted to obtain a written consent in late February 2021, Avaya refused.  It is my opinion that

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   Avaya was clearly employing legal tactics to force us into liquidation.

2       85.    I have prepared all the necessary documentation to close an asset sale for collab9,

3   including detailed financial information, employee information, operating costs post sale, detailed

4   schedules of equipment and depreciation of assets as well as compelling presentations and

5   customized value propositions to each prospective buyer.  NDAs (non-disclosure agreements) were

6   sent out and a Drop Box due diligence site was set up with 113 documents that would be required for

7   such a sale.  As of this time, eight companies have been contacted at the appropriate senior director

8   level to discuss their interest in acquiring the business/assets of collab9.

9       86.    I intend to vigorously continue my efforts to effectuate a sale of the business/assets of

10  collab9 designed to maximize value, preserve employee jobs, ensures continuity of operations of

11  critical government communications systems and avoid an extended (i.e., several months)

12  interruption of those services.

13      87.    collab9 asked me to market the company because I have significant experience and a

14  proven track record in this area, including: a successful IPO for En Pointe Technologies in 1996; a

15  $36M capital raise in 2000 for SupplyAccess; a successful sale of a division of En Pointe to Allied

16  Digital in 2008; successfully securing over $2M in funding from Cisco for collab9 in 2013; and

17  working with our investment banker in closing a $10M capital raise with Avaya in 2019.

18      88.    The company has retained the Law Offices of Herbert Hafif ("LOHH") as its special

19  litigation counsel to represent collab9 in pursuing its rights and remedies against Avaya.  An

20  application for court approval of LOHH's retention will be filed with the Court.

21      89.    collab9 intends to move this chapter 11 case forward on a diligent basis designed to

22  maximize the value of its business/assets and, accordingly, the recovery of holders of allowed claims

23  through a sale.   It does not appear, under the liquidity constraints and issues facing the Company,

24  that there is any other feasible approach to preserving and maximizing the value of the Debtor's

25  estate.

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

## FACTS IN SUPPORT OF "FIRST DAY" MOTIONS

**Motion for Order Authorizing Payment and/or Honoring of Pre-Petition Workforce Obligations, Including Compensation, Benefits, Reimbursements, Withholding Taxes, Accrued Vacation, and Related Claims
(the "Workforce Obligations Motion")**

90.     As of the Petition Date, the Debtor has 18 employees (2 of which are inactive and not drawing salary) (collectively, the "Employees" and each, an "Employee") and 4 independent contractors (collectively, the "Contractors" and each, a "Contractor").  There are no part-time Employees.  A true and correct list of the Debtor's current Employees and Contractors, including hire date, job title, rate type, work location, and various other wage information, is attached to the Workforce Obligations Motion as Exhibit "1."

91.     None of the individuals identified on Exhibit "1" to the Workforce Obligations Motion are insiders of the Debtor, as that term is defined in 11 U.S.C. § 101(31), except for, potentially, myself and Mustafa A. Baig, the Debtor's Chief Technology Officer (CTO).  While Mr. Baig and I hold the titles of officers, we are not on the Debtor's board and are not equity holders (members).  Pursuant to sections 5.1 and 5.2 of the Debtor's operating agreement, the management of the Debtor is controlled by the Debtor's Board of Directors.  Additionally, Gina Lim, the interim CFO, is an independent contractor and is not an officer other than in title.

92.     The Debtor uses ADP to process its payroll.  The Debtor pays its Employees twice a month, on the 7th and on the 23rd.  The payroll on the 7th relates to the prior month, days 15-31, and the payroll on the 23rd relates to the service dates of the 1st to the 15th of the current month.

93.     Three to four days prior to the pay date (about the 3rd and 20th of the month, depending on the weekend), funds from the Debtor's operating or money market bank account are transferred to the Debtor's payroll account to cover funds for the next payroll cycle.  ADP draws funds from the payroll account and pays the net payroll, and taxes on behalf of the Debtor. ADP receives, processes the payroll, collects and remits the taxes, and transfers the funds to the Employees by ACH.  ADP also files the quarterly and annual tax statements, returns and W-2 forms on behalf of the Debtor.

94.     The Debtor pays the cost for the employee benefits directly to the vendors, for health

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   insurance, life insurance, Health Savings plan and the 401K Plan.  For medical, dental and vision

2   insurance, the Debtor pays Blue Shield approximately $23,000 on the 1st of the month, which covers

3   insurance for the full calendar month.  The Debtor pays Lincoln National Life, approximately $1,370

4   on or near to the pay dates of the 7th and 23rd for the employee's life insurance.  The life insurance

5   cost is a pass-through of the employee contributions.  The Debtor also pays approximately $1,110 to

6   Health Equity Inc. for the Health Savings plan and approximately $4,800 to American United Life

7   for the employee contributions to the 401K Plan, both pass through employee contributions, on or

8   near the pay dates.  Contractors are paid directly by the Debtor upon receipt of an invoice.

9       95.    The average payroll obligation (including my salary) is approximately $110,000 each

10  pay period, paid to Employees on the 7th and on the 23rd.  The monthly average obligations to the

11  Contractors is approximately $31,640.

12      96.    The Debtor offers its full-time Employees medical, vision, dental, life insurance,

13  short-term disability (selected states), and long-term disability insurance plans.  The Debtor also

14  offers a Health Savings Account (HSA) to those Employees enrolled in a High Deductible medical

15  plan.  In addition, the Debtor offers its Employees the opportunity to participate in a 401(k) Plan,

16  funded through pre-tax employee contributions (a voluntary payroll deduction).  Employees accrue

17  vacation time each pay period, which time is usable as accrued.  Paid sick leave is awarded "up

18  front" as of the hire date, on a calendar year basis.  Unused sick time does not carry over and has no

19  monetary value upon termination of employment.

20      97.    At the close of each semimonthly pay cycle, Employees submit timecards reporting

21  time worked and any applicable expense reimbursements.  Contractors submit their invoices to the

22  Company for payment, either on a monthly or bi-monthly basis.  Managers approve the time worked

23  and expenses.  Thereafter, the Debtor's payroll department posts the expense reimbursements as a

24  "Reverse Deduction" into ADP.  This gets paid together with regular wages in the pay cycle.

25      98.    As a result of the Debtor's commencement of this case, absent Court order, I

26  understand the Debtor will be restricted from paying and/or honoring accrued and unpaid wages,

27  salaries, vacation, and other forms of employee compensation and benefits, as well as Contractor

28  compensation, attributable to the pre-petition period.

99.    In large part, the Debtor's ongoing operations, the opportunity for the Debtor to maximize the value of the Estate, the Debtor's ability to meet its obligations, and the Debtor's ability to ensure continuity of operations of critical government communications systems and avoid extended (i.e., several months) service interruptions are all dependent upon a stable and productive workforce.  Many of the Employees and/or the Contractors simply cannot afford to miss, or be deprived of, a pay period or payment or benefits they receive in the ordinary course of their engagement.  And, to the extent the Debtor is not authorized to make a full payroll payment to them on March 31, 2021, I believe that some of the Employees and/or Contractors will suffer extreme personal hardship and will likely seek employment elsewhere.

100.    The stability of the workforce pool is tenuous.  The labor pool is mobile.  At the same time, it could be difficult for the Debtor to find qualified replacement employees and/or independent contractors with the unfavorable publicity of disrupted pay or benefits.  Even if replacements could be hired, it could take significant time before they could be fully trained and qualified for the jobs, as many are required to obtain public trust clearances issued by the federal government through a process that takes months to years, resulting in further disruption and harm to the Debtor's business and the Debtor's ability to maximize the value of the Estate.

101.    Each of the Employees and Contractors for whom the Debtor requests the relief in the Workforce Obligations Motion is currently working for the Debtor (although as set forth in the Workforce Obligations Motion, 1 of the Employees is inactive and not drawing salary).  The Debtor will not pay pre-petition wages or compensation or claims to Employees or Contractors who are no longer engaged by the Debtor or to those Employees or Contractors who have notified the Debtor that they will be leaving.

102.    The Debtor is not seeking to pay out the vacation pay to the Employees, but only to honor accrued vacation days in the ordinary course of its business.  The Debtor will not pay any Employee or Contractor any amount for pre-petition claims in excess of $13,650.

103.    I anticipate that the Debtor's payroll for Employees, together with payments to Contractors, for the next payroll will total approximately $130,000.  Subject to Court approval of DIP financing and authorization to use cash collateral, I believe the Debtor has sufficient funds to

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    make this payment without rendering the Estate administratively insolvent.

2        104.    To the extent any employees of the Debtor, including myself, are determined to be

3    insiders, any payments to us will be subject to compliance with the requirements of the Office of the

4    United States Trustee.

5        **Motion for Order Authorizing Debtor to Maintain Bank Accounts and Cash Management
System and Continue Use of Its Existing Business Forms**

6        **(the "<u>Cash Management Motion</u>")**

7        105.    As of the Petition Date, the Debtor utilizes 3 main bank accounts (collectively, the

8    "<u>Debtor Accounts</u>") at Mechanics Bank, the Debtor's main bank based in Irvine, CA, which form the

9    Debtor's cash management system.  The accounts are: (1) a Main Operating Account; (2) a Payroll

10    Account; and a (3) Money Market Account with Mechanics Bank.  The Debtor also has one UBS

11    Account (defined below), which acts as an investment account.  The accounts are used solely and

12    strictly by the Debtor and for the Debtor's business and operations.

13        106.    Revenues and operating expenses flow through the Debtor's main operating account

14    (the "<u>Operating Account</u>") at Mechanics Bank.  Revenue is received from customers generally by

15    ACH to the Debtor's Operating Account and occasionally by a mailed check.  As most of the

16    Debtor's employees are currently remote, and work from home, the Controller retrieves the company

17    mail from the Debtor's Torrance office.  The Controller electronically deposits any checks received

18    in the mail with the bank using a remote deposit capture scanner.

19        107.    Operating expenses of the Debtor are generally paid to the company's vendors via

20    ACH and wire, and occasionally by check through the mail.  Due to the current virtual nature of the

21    company's business, and as employees are working remotely, there are only very few mailed checks

22    that are used in vendor payment.  Most invoices from vendors are sent to collab9's Controller or

23    project manager via e-mail.

24        108.    The Controller maintains and oversees the Debtor's cash flow which is reviewed by

25    the CFO each day.  The Controller maintains the timing of the payments upon the net terms and with

26    my approval or the approval of the CFO.  With respect to any ACH or wire, two persons are required

27    to set up and approve the transactions for internal control.

28        109.    The Debtor has a designated payroll account (the "<u>Payroll Account</u>") with Mechanics

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  Bank, which ADP draws to fund its payroll.  Payroll is paid to the employees twice a month, on the

2  7th and the 23rd by ADP, the Debtor's payroll processing service.  The payment on the 7th relates to

3  payroll for the prior month days 16-31, and the payment on the 23rd relates to the payroll for the

4  current month days 1-15.

5      110.    Three to four days prior to the pay date (about the 3rd and 20th of the month,

6  depending on the weekend), funds from the operating or money market bank account are transferred

7  to the Payroll Account to cover funds for the next payroll cycle.  ADP draws funds from the Payroll

8  Account and pays the payroll, benefits and taxes on behalf of the Debtor.

9      111.    The Debtor has an interest-bearing money market account (the "Money Market

10  Account") with Mechanics Bank, which houses any excess funds.

11      112.    The Debtor also has an investment account with UBS Financial Services (the "UBS

12  Account").  Currently it has a nominal amount of about $6,000.  The UBS Account was set up when

13  the company received the $10,000,000 loan from Avaya in May 2019 (described in further detail

14  above), which had a slightly higher interest than the Mechanics Bank Money Market Account.

15      113.    If the Debtor is required to close its existing accounts immediately, open all new bank

16  accounts and substantially alter its existing cash management system, there likely would be a

17  significant disruption in the Debtor's ability to collect and disburse funds in the ordinary course of

18  its operations.  Such a disruption would negatively impact the Debtor's ability to make a smooth

19  transition into chapter 11.  Accordingly, in the Cash Management Motion, the Debtor requests that

20  the Court enter an order authorizing (but not directing) the Debtor's continued use of its pre-petition

21  accounts, rather than opening new debtor in possession account or, the alternative, authorize a 60-

22  day transition period.

23      114.    Additionally, as a way of minimizing expense to the Estate, I believe the Debtor

24  should be permitted to continue to use its correspondence and business forms including, but not

25  limited to, e-mail, invoices, purchase orders, checks, letterhead, envelopes and other business forms

26  (collectively, the "Business Forms"), substantially in the form existing immediately before the

27  commencement of this chapter 11 case, without reference to the Debtor's status as a debtor in

28  possession.  I (on behalf of the Debtor) propose that, in the event the Debtor needs to purchase or

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

print new Business Forms during the pendency of this chapter 11 case, such forms will include a legend referring to the Debtor's status as a debtor in possession.

115.    If the Debtor is not permitted to maintain and utilize its cash management and banking system, and is not permitted to continue to use its existing Business Forms, I believe the Debtor, the Estate, and creditors will be prejudiced by: (a) the resulting disruption in the ordinary financial affairs and business operations of the Debtor; (b) potential delay in the administration of the Estate; and (c) the unnecessary cost to the Estate to set up new accounts and new systems and purchase/print new business forms.

116.    In order to prevent the inadvertent cashing of outstanding pre-petition checks by the Debtor's bank, the Debtor will provide Mechanics Bank and UBS Financial Services with notice of the commencement of the chapter 11 case and direction that outstanding pre-petition checks are not to be honored, unless and until a Court order (if any) is entered authorizing payment of such obligations.  If such an order or orders of the Court are entered, the Debtor's bank will be directed to honor checks for pre-petition obligations only to the extent the Court has authorized payment of such obligations.

**Motion for Interim and Final Orders Authorizing Debtor to Obtain Post-Petition Financing, Use Cash Collateral, and for Related Relief
(the "<u>DIP Financing Motion</u>")**[10]

117.    Through the DIP Financing Motion, the Debtor seeks to obtain post-petition financing (the "<u>DIP Loan</u>") , in the form of a line of credit,[11] from SecureComm and  authorization to use cash collateral, as well as additional related relief as more specifically described in the motion.  A true and correct copy of the Promissory Note and Security Agreement is attached to the DIP Financing Motion as Exhibit "1."  A summary of the key terms of the DIP Loan is set forth in the DIP Financing Motion.

---

[10] Capitalized terms in this section of this Declaration not otherwise defined shall have the meaning ascribed to them in the DIP Financing Motion.

[11] The amount of the DIP Loan includes the line of credit in the sum of $1,190,000 plus the roll-up of the $580,000 of prepetition secured financing debt, for a total DIP Loan amount of $1,770,000, plus fees (including attorneys' fees), costs, and interest incurred with respect to the prepetition secured debt financing as of the time that secured debt is paid under the DIP Loan.

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

118.    The Debtor's access to the financing to be provided under the DIP Loan is absolutely critical to the continued operation of the Debtor's overall business, to otherwise maximize the value of the Estate, ensure continuity of operations of critical government communications systems and avoid extended (i.e., several months) service interruptions, and allow the Debtor the opportunity to implement an expeditious sale process needed to preserve and maximize the value of the Estate.

119.    The Debtor requires the DIP Loan for additional working capital.  The Budget accompanying the DIP Financing Motion – which identifies payments and expenses the Debtor requires to fund for the next 13 weeks post-petition in order to maintain  continued operations as the Debtor works towards a sale for the benefit of the Estate and creditors – contemplates and is predicated upon the Debtor obtaining the DIP Loan.

120.    The debtor-in-possession financing ("DIP Financing"), together with the use of cash collateral, is necessary and essential to provide the Debtor with the required working capital to fund operations until it accomplishes a sale.  Therefore, it is imperative that the Debtor obtain immediate authority to obtain the DIP Loan.

121.    With certain expenses requiring the use of cash collateral and the funds from the DIP Loan each week through the 13-week projected Budget, the Debtor seeks an emergency hearing on this Motion.  The Debtor requires the immediate use of cash collateral and use of cash collateral alone is not sufficient to fund operations during this time period.  Further, in order to maintain confidence of customers, contract counterparties, employees, and other stakeholders in the Debtor and its ongoing operations, it is imperative the line of credit under the DIP financing be approved and put into place without delay.

122.    Without the prepetition secured loan from SecureComm, the Debtor would be out of cash at this time. Further, if the Debtor does not obtain immediate authority to use cash collateral and authority to implement the DIP Loan, the Debtor would essentially be forced out of business.  In short, the Debtor must have uninterrupted access to cash, which includes use of cash collateral and the cash from the DIP Loan, to continue operations.

123.    As reflected in the Budget, the Debtor cannot continue to fund operations with cash collateral alone.  Rather, the Debtor needs the additional financing in the projected amount of

$1,190,000 for the 13-week period of the Budget (through June 20, 2021).  These funds will be used to satisfy post-petition administrative expenses and operational expenses, including, for example, the payment of rent, normal course operating expenses, including expenses to keep collab9's infrastructure operating consistently and efficiently.  Any disruption in service will  be catastrophic for operations and will cause national security and health consequences with large federal government organizations.   Further,  in accordance with the Budget, which includes certain payments that must be made in the immediate future in the ordinary course of business, interim and final approval of the financing is necessary and crucial to the Company.

124.    All payments described in the Budget – which requires the funds from the DIP Loan - are necessary to maintain and continue the Debtor's operations and to maximize the value of the Estate.  Failure to make payments in accordance with the Budget could result in immediate and irreparable harm to the Debtor's operations, the value of the Estate, and the interests of creditors, could result in the sudden discontinuation of operations of critical government communications systems and create extended (i.e., several months) service interruptions, and the destruction of the opportunity for the Debtor to run an expeditious sale process and consummate a sale.

125.    Based on the foregoing, absent the immediate approval of the DIP Loan, and the Debtor's access to the loan proceeds, the Debtor will not have sufficient funds to sustain operations to the irreparable detriment of the Debtor, the Estate, creditors, customers and the Debtor's prospects for reorganization.

126.    The proposed DIP Loan is very favorable to the Debtor and the Estate, especially in relation to any potential financing from any third-party sources of which I am aware.  The Debtor has attempted to locate financing from other non-insider sources without success.  More specifically, we have consulted with other potential lenders, including the Debtor's bank, Mechanics Bank and Lawrence Financial, and a firm specializing in obtaining loans  for companies suffering financial distress to assist it in locating financing.

127.    Those efforts did not result in the procurement of more favorable financing.  Moreover, we were unable to locate any lender who would make a loan to the Debtor under the current circumstances, even with the assistance of a firm specializing in obtaining loan for

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    companies attempting to work through financial challenges and distress.

2        128.    Further, my understanding is that any proposed loan from a third-party lender would,

3    if it could be obtained at all: (a) not be on terms as favorable to the Debtor as the DIP Loan; and (b)

4    likely include various conditions precedent and due diligence periods that likely would drag the

5    process out beyond an acceptable period to help alleviate the Debtor's immediate need for cash.

6        129.    Given the Debtor's current financial condition and capital structure, I do not believe

7    the Debtor is able to obtain: (i) adequate unsecured credit allowable either (a) under sections 364(b)

8    and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code; or (ii)

9    adequate credit secured by a senior lien on (a) unencumbered assets of its estate under section

10    364(c)(2) of the Bankruptcy Code or (b) any other junior lien on encumbered assets under section

11    364(c)(3) of the Bankruptcy Code, from sources other than SecureComm on more favorable terms

12    than those of the DIP Loan.  As stated above, the Debtor has been unable to locate any other funding

13    source.

14        130.    The only source of credit available to meet the Debtor's current needs and on an

15    immediate basis of which I am aware is the DIP Loan.  The Debtor requires both additional

16    financing under the DIP Loan and the use of cash collateral in order to satisfy its current and future

17    post-petition liquidity needs.

18        131.    The Budget was prepared based upon historical assumptions of the Debtor's business.

19    The Budget also is based upon securing the DIP financing to provide cash liquidity to operate the

20    business.  Post-petition operational expenses are based upon current vendor, service, and lease

21    contracts, payroll obligations, and certain estimated chapter 11 administrative expenses.

22        132.    In addition to various categories of general operating expenses, including payments

23    on the Debtor's office space lease, the Budget contains line items for U.S. Trustee fees.  As the

24    Budget reflects, based on the assumptions underlying the Budget, the Debtor will be able to operate

25    post-petition with the use of DIP financing and cash collateral through the 13-week period covered

26    by the Budget.

27        133.    All payments described in the Budget are necessary to maintain and continue the

28    Debtor's operations and to maximize the value of the Estate.  Failure to make payments in

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   accordance with the Budget could result in immediate and irreparable harm to the Debtor's

2   operations, system security profile, critical government communications systems, the value of the

3   Estate, and the interests of creditors.

4          134.    The Budget reflects that, with the anticipated DIP Financing and funds generated

5   from operations, the Debtor will be able to meet operating and administrative expenses for at least

6   the next 13 weeks.  Further, the Debtor believes that the Budget and the assumptions underlying the

7   Budget are reasonable and appropriate under the circumstances.

8          135.    The Debtor's use of cash collateral as set forth in the Budget is necessary in order to

9   allow the Debtor to move forward with its sale process and sale consummation.  The Debtor's

10  uninterrupted access to cash is critical to maintaining operations.  Therefore, absent an immediate

11  hearing and entry of an order granting the DIP Financing Motion, the Debtor would not have access

12  to sufficient cash to pay ordinary and necessary expenses essential to continuing its operations,

13  which, in turn, would irreparably jeopardize the Debtor's prospects for a successful sale needed to

14  maximize the value of the Estate for the benefit of creditors, and it could result in the sudden

15  discontinuation of operations of critical government communications systems and create extended

16  (i.e., several months) service interruptions.  As shown in the DIP Financing Motion, SecureComm

17  consents to the Debtor's use of cash collateral as set forth therein.

18         136.    The Declaration of Gina Lim, CPA and the Debtor's interim CFO, submitted

19  concurrently herewith gives further information regarding the 13-week projection of operations,

20  including all of the income and expense presumptions that are found in that projection/budget.  A

21  true and correct copy of the Budget is attached as Exhibit "1" to the Declaration of Gina Lim.

22         137.    The Declaration of Haze Walker of Lawrence Financial submitted concurrently

23  herewith further demonstrates the Debtor's inability of obtaining financing other than the DIP

24  Financing to be provided by SecureComm.

25         138.    The Budget also includes payments of $25,000 per week to the law firm of Sulmeyer

26  Kupetz, the Debtor's General Bankruptcy Counsel.  These payments are part of the agreed upon

27  funding by SecureComm of interim fees which Sulmeyer Kupetz will maintain in its trust account

28  subject to an interim fee procedure which I understand will be presented by Sulmeyer Kupetz to the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    Court in its employment application.  Further, the budget includes monthly payments to the

2    Independent Director, Mr. Blanco.  His compensation shall be $5,000 per month for 15 hours of his

3    time.  All time spent on this matter in excess of 15 hours will be billed to the Debtor at the rate of

4    $395.00 per hour.

**Motion for Order Limiting Extent of Notice Required for Administrative Matters and
Authorizing Service by E-mail
(the "<u>Limit Notice Motion</u>")**

7    139.    The Debtor has approximately 100 creditors and other parties in interest identified

8    on the Debtor's master mailing list.  Further, the Debtor contemplates that it may be required to

9    bring numerous administrative matters before the Court in this case.  I believe that limiting the

10   extent of notice required for such matters will greatly reduce the substantial burden and expense

11   that would be imposed upon the Estate if the Debtor is required to provide notice of all

12   administrative matters in this case to all of its creditors and various other parties.

13   140.    At the same time, a creditor or other party in interest desiring to receive notice of

14   administrative matters can ensure that notice will be received by filing and serving a request for

15   special notice.

16   141.    In order to save the Estate substantial expense in postage and copying costs, and to

17   make receipt of documents more convenient and expedient for various interested parties, the Debtor

18   also requests that the Court authorize the Debtor to serve notices, pleadings, and other documents

19   filed in this case by e-mail on all parties (except as the Court may order otherwise with respect to

20   particular matters), with no requirement to serve such papers by any other method unless a party

21   expressly requests service by mail.

22   142.    The Debtor seeks to reduce the burden and expense of providing notice of all

23   administrative matters in this case.  Service of notices, pleadings, and other documents filed with the

24   Court by e-mail on parties who consent, in advance, to receiving service of documents by e-mail will

25   dramatically reduce postage and copying expenses in this case and will expedite service in a manner

26   that many parties will likely find preferable to the other more costly alternatives.  Further, I believe

27   that the Court's approval of the Limit Notice Motion will eliminate the necessity and expense of the

28   Debtor requesting limited notice separately in each administrative matter as it arises.

### Motion for Extension of Time to File Schedules, Statement of Affairs, and Lists
### (the "Schedules Motion")

143.    In the Schedules Motion filed by the Debtor, the Debtor requests an extension of time of thirty (30) days to file its bankruptcy schedules, statement of affairs, and lists.

144.    The Debtor's accounting department consists of only 2 people, comprised of the Debtor's interim CFO and Controller, plus an additional independent contractor who provides human resources and payroll consulting services to the Debtor.  The accounting department handles the general bookkeeping duties for the company, which include accounts payable and receivables and the employee expense reimbursement program.  This accounting department also must prepare for annual reviews, respond to various internal/external requests for company financial data and assist in sales/use tax payment, quarterly reconciliations and audits.

145.    Upon commencement of this case, in order to continue its operations and avoid irreparable harm to the Estate, the Debtor was required, among other things, to file various "first day" motions as identified herein.  These matters required the immediate attention of the Debtor and its accounting personnel.

146.    The Debtor's accounting personnel are working diligently to compile and analyze the information necessary to prepare the Debtor's schedules, statements, and lists.  However, voluminous documentation and records must be reviewed.  The Debtor requests additional time to ensure an adequate opportunity to properly gather all information necessary to complete the Schedules and to ensure the Schedules contain accurate information.

147.    In this case, merely compiling and preparing the information required by the Office of the United States Trustee under its initial requirements will require many hours of attention of the Debtor's accounting personnel.

148.    For these reasons, especially given the Debtor's small accounting department and limited accounting personnel who have been and will continue to be tasked with searching and compiling the information for the Debtor's Schedules and initial bankruptcy commencement papers, the Debtor needs additional time to prepare and finalize the Debtor's schedules, statements, and lists as set forth in the Schedules Motion.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Motion for Approval of Sale and Motion for Approval of Sales Procedures and Related Milestones (the "Sale Motion")**

149.    The Debtor must exit Chapter 11 as quickly as possible.  Given the grievous damage done to the Company by its relationship with Avaya, the Company has had negotiations with Dollab and its affiliate, SecureComm, the only sources of funding the Debtor has been able to locate.  The DIP Financing is subject to  a number of conditions, including:

(a)    That the Debtor  file its combined motion for approval of sale and bidding procedures and its sale of its business/assets no later than 14 days following the commencement of the Debtor's chapter 11 case (the "Sale Procedures and Sale Motion").

(b)    That the Sale Procedures and Sale Motion will facilitate competing bids for the Debtor's business/assets.  The proposed bidding procedures contained in the Sale Procedures and Sale Motion are to be designed to promote a competitive, fair, and expedient sale process that seeks to maximize the value of the Debtor's estate under the urgent circumstances and liquidity crisis facing the Debtor.  If approved, the bidding procedures will allow the Debtor to continue to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Debtor's assets on a schedule consistent with the milestones detailed in the DIP Financing Order, the Bidding Procedures' Order and the Debtor's chapter 11 objectives.

(c)    Due Diligence: The Debtor will provide any potential bidder, subject to execution of a non-disclosure agreement, such due diligence access or additional information as the Debtor, in consultation with the Independent Director, deems appropriate, which may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information.

(d)    That the successful bidder agree to continue to conclusion the Debtor's existing customer contracts which contracts will be expressly assumed by the Debtor and assigned to the successful bidder.

(e)    That certain milestones with respect to the Debtor's operations and court approval of the bidding procedures and sale are met, including that the Debtor must obtain approval of the sale by  May 20, 2021 and that the sale must close by May 31, 2021, which is when the Debtor's DIP Financing is projected to be exhausted and consensual use of cash collateral shall end.

150.    Sales and Marketing Process:  The insiders of the Debtor, Dollab, LLC and Dinco, LLC, have invested as equity and debt an amount into the Debtor which exceeds $15,000,000 and may be considerably more than that, independent of their loans (which are subordinating to repayment of the Avaya obligation, if any.  The Court may hear derogatory comments from Avaya

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    about one or both of the Debtor's principals, and perhaps even about me, personally. Avaya may

2    even attempt to argue about the future of collab9's business, a future that they did everything

3    possible to destroy. These are diversions made for the purpose of attempting to take the Court's

4    attention away from the issues that are most pressing: (a) the Debtor is out of cash; (b) the Debtor is

5    prohibited by its Convertible Note of $10 Million with Avaya from having funds invested in it on a

6    secured basis other than through this Chapter 11 case and the Debtor in Possession Financing

7    Motion; (c) the Debtor has been telling Avaya for ten months that it was going to run out of cash in

8    early 2021, and every month they heard this at meetings; (d) Avaya has done nothing to provide the

9    Debtor with needed operating capital although they have been asked for it repeatedly given their

10   position in the Company; and (e) with the exception of SecureComm, no lender is willing to lend to

11   the Debtor on any basis, secured or unsecured. In a situation involving a company losing $400,000

12   per month in its operations, is it any wonder that no one is interested? Only the insider(s) are

13   interested in providing financing, and this financing is conditioned on the Company expeditiously

14   implementing a sale process under Section 363 of the Bankruptcy Code, which sale must be

15   approved by May 20, 2021, and which must close by May 31, 2021.

16   　　　　151.　　I have long experience in the Debtor's industry, as my credentials indicate. I have

17   marketed the Debtor's assets to a known set of potential buyers with whom I have been familiar for

18   many years, and I will continue to vigorously market and pursue a sale of the Debtor's

19   business/assets while addressing the urgent situation facing the Debtor. The Debtor did interview an

20   investment banker in order to consider having an investment banking firm market the Debtor's

21   assets. However, because of the urgent current circumstances facing the Debtor and the relatively

22   small size of the transaction, the investment banker we spoke with insisted on a minimum fee no

23   matter what the sale price was, which was cost-prohibitive to a Debtor under its current

24   circumstances. The DIP budget has been separately submitted with the Declaration of Gina Lim,

25   CPA, the Debtor's outside consultant who is performing interim Chief Financial Officer duties for

26   collab9. That budget involves providing cash sufficient for the Debtor to meet its operating needs

27   and professional fee payments and bridge operating losses each month, which are approximately

28   $400,000, while facilitating the opportunity to implement an expeditious sale process and complete a

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  sale for the benefit of all interested parties and which would allow the Debtor to maximize value,

2  maintain a going concern, preserve jobs for employees, and avoid disruption of critical governmental

3  systems dependent on ongoing operation of the business of collab9.

4       152.  It is necessary for the Debtor to move forward very quickly given the crippling

5  damage and cash flow shortages from which it suffers as a result of Avaya's unilateral termination of

6  its agreements with collab9.  Since that time and until year end, 2020, Avaya's discussions with me

7  and the Company were that there was a possibility to restart the business relationship, and provided

8  that we did not burn any bridges, once Avaya realized the mistake they had made they might restore

9  our relationship.  Most importantly, Avaya spoke of how the various lucrative contractual

10  agreements made by collab9 with federal and state governmental agencies might be renewed once

11  our business relationship was re-established.  None of this turned out to be accurate, and certainly

12  none of these things happened.  Since the end of 2020, when the Company determined that it would

13  not be able to do business with Avaya, collab9 has been engaged in negotiations with the Debtor's

14  existing equity holders regarding a recapitalization of the Company.  It became clear that, among

15  other things, the Avaya Convertible Note was a complete impediment to any third-party investment

16  or recapitalization and that a Chapter 11 case would be necessary in order for this to happen.

17       153.  Also during the last two months, the Company engaged litigation counsel and

18  commenced an arbitration proceeding against Avaya as provided in  underlying agreements between

19  the Debtor and Avaya.  The arbitration is pending before JAMS in New York.  This litigation, along

20  with the sale of the Debtor's business/assets, provides unsecured creditors with allowed claims in this

21  bankruptcy case with the best opportunity to receive a meaningful recovery.  It is anticipated that the

22  litigation will continue after the sale is approved and closes, and it is contemplated that the Debtor

23  will thereafter propose a liquidating Plan of Reorganization in this bankruptcy case.

24       I declare under penalty of perjury that the foregoing is true and correct and that this

25  declaration was executed on March 22, 2021, at Longmont, Colorado.

26

27  _____
        Kevin B. Schatzle

28